UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| SPHERETEX GmbH,<br><br>                *Plaintiff*,<br><br>    v.<br><br>CARBON-CORE CORP.,<br><br>                *Defendant*. | Case No.: 3:20-cv-00053<br><br>MEMORANDUM OPINION<br>& ORDER<br><br>Judge Norman K. Moon |

      Plaintiff Spheretex GmbH, a German company, filed a four-count complaint against Defendant Carbon-Core Corp., a Virginia company, alleging breach of contract, trade secret misappropriation, and trademark infringement and unfair competition, both in violation of the Lanham Act. In this motion, Defendant seeks dismissal of the Lanham Act claims. Defendant's argument hinges on one element of those claims—whether Plaintiff has shown that Defendant's mark creates a "likelihood of confusion" with Plaintiff's own marks. Because Plaintiff's complaint includes allegations giving rise to a plausible trademark infringement claim, the Court will deny the motion.

Background

      For over thirty years, Plaintiff "has been a leading manufacturer of laminable core products, including its signature Sphere.core and Sphere.tex laminate bulker product lines." Am. Compl. ¶ 73.[1] Plaintiff's products combine "fibers" and "thermoplastic microspheres," and "are

---

[1] As this matter is before the Court on a motion to dismiss, the Court must assume the truth of the facts alleged in the amended complaint and draw all reasonable inferences in favor of the plaintiff. *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019).

1

used by a worldwide customer base in a variety of industries, including construction, automobiles, marine vessels and watercraft, pools and spas, piping, and medical equipment." *Id.* ¶ 11. Indeed, Plaintiff has a network of over fifty distributors, through which its products are "sold and distributed worldwide." *Id.* Other companies produce laminate bulkers, but Plaintiff had been the only manufacturer using glass fibers, instead of polyester fibers—until Defendant began doing so as well. *Id.* ¶ 12.

Since 2014, Defendant had been the exclusive distributor of Plaintiff's products in the United States and Canada. *Id.* ¶ 2. That year, the parties entered into a distribution agreement that was to be in force until 2016. It also contained an "evergreen clause" stating that the agreement would automatically renew for another two-year term unless terminated within six months' notice before the end of the term. *Id.* ¶ 13. Under the agreement, Defendant was obligated to exercise its best efforts to promote the sale of Plaintiff's products, and that Defendant would not distribute any products that directly competed with Plaintiff's products while the agreement was in force. *Id.* ¶ 14. Also under the agreement, Plaintiff provided Defendant with its U.S. and Canada customer list and existing book of business. *Id.* ¶ 15. In April 2017, the parties entered into a new exclusive distribution agreement, which was in effect between May 1, 2017, and December 31, 2018. *Id.* ¶ 22. Like the earlier agreement, the 2017 agreement contained an "evergreen clause" which would automatically renew for another year unless it was terminated no later than six months before its expiration. *Id.* This agreement required Defendant to "exercise its best efforts to develop the largest possible market for the Products in the Territory." *Id.* ¶ 23. Defendant also agreed that it would not distribute any products that would directly compete with Plaintiff's products during the term of the agreement. *Id.*

Mr. Gerhards was Plaintiff's CEO from 2010 until March 2017, at which point he continued to work for a time as a consultant for Plaintiff. *Id.* ¶¶ 16, 26. In April and May 2017, while Gerhards was still Plaintiff's consultant, he formed two German companies, including ESGE. *Id.* ¶ 26. In August 2017, Defendant began to import acrylic binder and glass fiber veil from ESGE—which materials are "unique in their use to manufacture Plaintiff's key laminate bulker products." *Id.* ¶ 27. Then, in April 2018 (during the period in which Defendant's 2017 distribution agreement was still in effect), Gerhards and Defendant entered into a consulting agreement in which the parties agreed "to manufacture, set up to operational condition all equipment and selection of raw materials to manufacture volumized polyester fiber and fiberglass product rolls," *i.e.*, "products identical to those manufactured by [Plaintiff] utilizing its trade secrets." *Id.* ¶ 28. The consulting agreement between Gerhards and Defendant further provided that Gerhards would become Defendant's VP of Engineering upon expiration of his non-compete agreement with Plaintiff. *Id.* ¶ 29.

In January and February 2019, Defendant imported from Germany machinery and parts "needed to recreate the one of a kind production assembly used by Plaintiff to manufacture its laminate bulker product lines." *Id.* ¶ 30. The production assembly is comprised of "nearly a dozen sub-assembly units delivered by third party vendors, and which are, in large parts, designed and developed by Plaintiff and units produced according to Plaintiff's specific specifications." *Id.* Plaintiff alleges that Defendant and Gerhards collaborated to misappropriate Plaintiff's trade secrets to "recreate the unique machinery and complicated configuration needed to manufacture Plaintiff's key laminate bulker products." *Id.*

Plaintiff is the owner of common law trademark rights in and registrations with the U.S. PTO, for the marks SPHERETEX (Reg. No. 4,078,591) and SPHERECORE (Reg. No.

2,004,038). *Id.* ¶ 56. In November 2018, Defendant applied to trademark the name "Spherecel," and identified goods and services described as "Laminate bulkers in the nature of non-woven bonded polymeric fibers for use in manufacturing." *Id.* ¶ 29. In October 2019, Defendant submitted a statement of use of its SphereCel trademark in commerce to the U.S. PTO, and a photograph of the SphereCel product to show it sells SphereCel products in the U.S. market. *Id.* ¶ 32. "The SphereCel photograph submitted by [Defendant] to the [U.S. PTO] shows a laminate bulker indistinguishable (other than packaging) from Plaintiff's Sphere.core product." *Id.*

In December 2019, Defendant began shipping its own SphereCel products to consumers that had instead ordered Plaintiff's Sphere.core products from Defendant. *Id.* ¶ 35. Indeed, Plaintiff's representatives visited U.S. customers in early 2020, and confirmed several instances where customers received Defendant's SphereCel products, rather than Plaintiff's Sphere.core products. *Id.* ¶ 35.

Moreover, "in an effort to further create confusion" between Defendant's and Plaintiff's products, Defendant "assigned the *exact same 15-digit product number* of several of Plaintiff's products to [Defendant's] analogous SphereCel products." *Id.* ¶ 36 (emphasis added). For example, Defendant assigned its SphereCel GF 2,0 mm laminate bulker the very same product number as Plaintiff's Sphere.core S 2,0 mm laminate bulker: 198003010002003. Similarly, Defendant assigned its SphereCel SBF 6,0 mm laminate bulker the very same product number as Plaintiff's Sphere.core SBC 6,0 mm laminate bulker: 198018012706011. *Id.* ¶ 36.

In February 2020, one of Plaintiff's U.S. customers informed Plaintiff that it was now buying competing laminate bulker from Defendant. *Id.* ¶ 37. Less than a week later, another of Plaintiff's customers informed Plaintiff that the product it purchased through Defendant had been delivered in "SphereCel" packaging. *Id.* ¶ 38. Plaintiff alleges that it believes Defendant

4

packaged Plaintiff's Sphere.core product in "SphereCel" packaging "in an effort to mislead consumers and to pass Plaintiff's product as its own or otherwise falsely imply a sponsorship by, or affiliation with, Plaintiff." *Id.*

Defendant has also used Plaintiff's Registered Marks "in its product webpages for SphereCel products." *Id.* ¶ 40. Defendant's product webpages for its SphereCel products "were word-for word copies of the product webpages for analogous Spheretex products." *Id.* And further still, "several of [Defendant's] webpages for SphereCel products used Spheretex's Registered Marks in product descriptions." *Id.* Plaintiff alleges that Defendant's "use of identical product webpages, product descriptions, and marketing information, including its use of Plaintiff's Registered Marks in descriptions of SphereCel products, was designed to cause consumer confusion between [Defendant's] SphereCel products and Plaintiff's registered Sphere.core and Sphere.tex products." *Id.*

## Standard of Review

"A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the claims pled in a complaint." *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019). It does not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016).

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). "This pleading standard does not require detailed factual allegations." *ACA Fin. Guar. Corp.*, 917 F.3d at 211 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Instead, "[t]o meet the Rule 8 standard and 'survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."'" *Nadendla v. WakeMed*, 24 F.4d 299, 305 (4th Cir. 2022)

5

(quoting *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, with all allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor, *King*, 825 F.3d at 212. However, the Court need not "accept the legal conclusions drawn from the facts," or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (internal quotes omitted).

## Reasoning

To prevail on a trademark infringement claim under the Lanham Act, a trademark holder must ultimate prove: "(1) that it possesses a mark; (2) that the opposing party used the mark; (3) that the opposing party's use of the mark occurred in commerce; (4) that the opposed party used the mark in connection with the sale, offering for sale, distribution, or advertising of goods or services; and (5) that the opposing party used the mark in a manner likely to confuse consumers." *Lamparello v. Falwell*, 420 F.3d 309, 313 (4th Cir. 2005) (cleaned up). The unfair competition claim under the Lanham Act would similarly require the plaintiff to show that the "defendant used the mark in a manner likely to confuse consumers." *People for the Ethical Treatment of Animals v. Doughney*, 263 F.3d 359, 364 (4th Cir. 2001); *Sycamore Brewing, LLC v. Stone Brewing Co.,* LLC, No. 3:22-cv-148, 2022 WL 1185895, at *3 (W.D.N.C. Apr. 21, 2022) ("[t]he test for likelihood of success on an unfair competition claim under the Lanham Act is nearly identical to the test for trademark infringement"); Dkt. 79 at 6–7 (Defendant arguing that the required elements of an unfair competition claim are "essentially the same" as that of trademark infringement); Dkt. 98 at 3 (similar).

In this case, it is only the fifth element—that the opposing party used the mark in a manner likely to confuse consumers—that is at issue. Dkt. 98 at 3–4; Dkt. 101 at 3 (Defendant agreeing its "core argument is that there simply is no likelihood of confusion"). To determine whether a likelihood of confusion exists, courts in the Fourth Circuit examine nine factors:

(1) The strength or distinctiveness of the plaintiff's mark as actually used in the marketplace;

(2) The similarity of the two marks to consumers;

(3) The similarity of the goods or services that the marks identify;

(4) The similarity of the facilities used by the markholders;

(5) The similarity of the advertising used by the markholders;

(6) The defendant's intent;

(7) Actual confusion;

(8) The quality of the defendant's product; and

(9) The sophistication of the consuming public.

*Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 660 (4th Cir. 2018). However, these factors are "not meant to be a rigid formula for infringement," but "only a guide—a catalog of various considerations that may be relevant in determining the ultimate statutory question of likelihood of confusion." *Id.*

At bottom, determining the likelihood of confusion "is an 'inherently factual' issue," and it depends on the facts and circumstances in each case. *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 933 (4th Cir. 1995) (quoting *Anheuser-Busch, Inc. v. L. & L. Wings, Inc.*, 962 F.2d 316, 318 (4th Cir. 1992)). As a result, "courts hesitate to dismiss trademark

infringement claims at the Rule 12(b)(6) stage." *JHT Tax LLC v. DM3 Ventures, Inc.*, No. 3:20-cv-176, 2021 WL 4471597, at *8 (E.D. Va. Sept. 29, 2021).

*Factor 1*. The first factor, the "strength of [Plaintiff's] mark—is paramount in determining the likelihood of confusion." *See Grayson O. Co. v. Agadir Int'l LLC*, 856 F.3d 307, 314 (4th Cir. 2017) (cleaned up). The strength of the mark means "the degree to which a consumer in the relevant population, upon encountering the mark, would associate the mark with a unique source," and the "strength" is "evaluated in terms of its conceptual strength and commercial strength." *CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 269 (4th Cir. 2006). In the Fourth Circuit, word marks are classified into four different categories: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful, and "[u]nder this hierarchy of distinction, generic marks receive no protection, descriptive marks require proof of secondary meaning to be eligible for protection, while suggestive or fanciful marks are inherently distinctive." *Swatch, S.A. v. Beehive Wholesale, LLC*, 888 F. Supp. 2d 738, 748 (E.D. Va. 2012).

Plaintiff argues that the U.S. PTO's registration of its two marks – SPHERETEX and SPHERECORE, is "prima facie evidence that the marks are distinctive," the first factor. Dkt. 98 at 5. On that point, there is no dispute. Dkt. 101 at 4; *see, e.g.*, *Central Source LLC v. annualdcreditreport.com*, No. 1:14-cv-304, 2014 WL 3811162, at * (E.D. Va. Aug. 1, 2014) (citing *America Online, Inc. v. AT & T Corp.*, 243 F.3d 812, 816 (4th Cir. 2001)) ("The registration for the AnnualCreditReport mark on the Principal Register is *prima facie* evidence that the mark is at least descriptive and has acquired distinctiveness."). Rather, Defendant argues that point is "subject to rebuttal," and that Plaintiff has not "describe[d] the strength of Plaintiff's Marks or how its marks are inherently distinctive." Dkt. 101 at 4. But therein lies the problem. Even though such a prima facie case is "subject to rebuttal," Defendant has not done so. *See id.*

8

On the one hand, Defendant correctly argues that Plaintiff's amended complaint includes few allegations specifically concerning the commercial strength of *Plaintiff's marks*. *See Grayson O. Co.*, 856 F.3d at 315 ("A mark's strength comprises both conceptual strength and commercial strength."). On the other hand, the Amend Complaint does allege that "[f]or more than 30 years, Plaintiff has been a leading manufacturer of laminable core products," which are "used by a worldwide customer base in a verity of industries," through its "network of more than fifty distributors." Am. Compl. ¶ 11. And Plaintiff's "signature" laminate bulker product lines were Sphere.core and Sphere.tex. *Id.* ¶ 29. Moreover, no other entity manufactured laminate bulkers in the way Plaintiff did, until Defendant began to do so. *Id.* ¶ 12. The arguments concerning the most appropriate classification of Plaintiff's marks could stand to be more developed (especially by Plaintiff). But at this early stage of the case, the Court concludes that Plaintiff has sufficiently alleged the strength of Plaintiff's marks, such that this factor weighs somewhat (though not decisively) in Plaintiff's favor on the confusion analysis.

*Factor 2*. The second factor turns on whether there is "a similarity in sight, sound, and meaning" which might cause confusion regarding the marks. *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 396 (4th Cir. 2009). In this inquiry, courts focus "on the dominant portions of the parties' marks." *Id.* In this case, a high degree of similarity exists between Plaintiff's Sphere.core and Sphere.tex marks, Am. Compl. ¶¶ 29, 56, and Defendant's ShereCel mark, *id.* ¶ 32. Contrary to Defendant's argument, the "dominant portion of the parties' marks" is "*Sphere*," not what follows: "core", "tex", and "cel". *See Good 'Nuff Garage, LLC v. McCulley*, No. 3:21-cv-571, 2022 WL 4485810, at *8 (E.D. Va. 2022) (holding that a "high degree of similarity exists between Plaintiff's marks," "GNG" and "GNG Motorsports", and Defendants' "GNG Performance" mark, and explaining that "[t]he dominant term within all three marks is the

9

distinctive mark, 'GNG.'"). As in *Good 'Nuff Garage*, the high degree of similarity between the dominant portions of the marks places the "second factor of the confusion analysis strongly in favor of Plaintiff." *Id.*

*Factor 3.* The parties agree that "similarity of the goods" has been adequately pled for purposes of this motion. *See* Dkt. 101 at 5 (Defendant, writing that "similarity of goods" was "adequately pled"). Accordingly, Factor 3 also supports Plaintiff in establishing a likelihood of confusion.

*Factor 4.* When considering the "similarities of the facilities used by the markholders," the "courts are trying to determine if confusion is likely based on how and to whom the respective goods of the parties are sold, and the key question is whether both products [are] sold in the same channels of trade." *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 155 (4th Cir. 2012) (internal quotation marks omitted). But any "similarities in the channels of trade must be analyzed based on the channels of trade contemplated by the [trademark] application," and so "if an application does not delimit any specific trade channels of distribution, no limitation will be applied." *Seacret Spa Int'l v. Lee*, No. 1:15-cv-405, 2016 WL 880367, at *5 (E.D. Va. Mar. 8, 2016). Because Plaintiff does not make any argument on this factor and the complaint includes no information about channels of trade contemplated by the trademark application, the factor does not weigh for or against a likelihood of confusion.

*Factor 5*. Plaintiff's amended complaint includes numerous non-conclusory factual allegations that establish a similarity of advertising. Plaintiff alleges that Defendant used Plaintiff's registered marks on Defendant's product webpages for its SphereCel products; that Defendant's webpages for its SphereCel products included "word-for-word copies of the product webpages for analogous [Plaintiff] products," and that Defendant's webpages used Plaintiff's

10

registered marks in its own product descriptions. Am. Compl. ¶ 40. Plaintiff has further alleged that Defendant's use of "identical product webpages, product descriptions, and marketing information," was designed to create customer confusion. *Id.* Moreover, Plaintiff has adequately pled an overlapping customer base, as Defendant had Plaintiff's U.S. customer list, and sold competing products to numerous of those customers. *See* Am. Compl. ¶¶ 15, 35–39; *see also Select Auto Imports Inc. v. Yates Select Auto Sales, LLC*, 195 F. Supp. 3d 818, 837 (E.D. Va. 2016) (explaining that "[a] finding of similarity of advertising requires 'some degree of overlap' among the parties' outlets and customers bases, but the two need not be identical"). Defendant's arguments to the contrary are unpersuasive. Dkt. 101 at 6. Defendant's alleged use of identical website product detail and language as Plaintiff renders it more than plausible Factor 5 supports a likelihood of confusion. *See, e.g.*, *Putt-Putt, LLC v. 416 Constant Friendship, LLC*, 936 F. Supp. 3d 648, 658 (D. Md. 2013) (holding that, among other things, "the content on the website" and "widespread access to [defendant's] online representations" supported that the "advertising factors weigh significantly" in plaintiff's favor).

*Factor 6*. The sixth factor considers Defendant's intent in using the challenged mark. As a generally matter, "[i]f there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion, since one intending to profit from another's reputation generally attempts to make his signs, advertisements, etc., to resemble the other's so as to deliberately induce confusion." *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1535 (4th Cir. 1984). This factor is "extremely probative in infringement cases." *Id.*

Here, Plaintiff has more than sufficiently alleged that Defendant intentionally used Plaintiff's challenged marks to attempt to induce confusion by buyers, including notably that Defendant's new SphereCel product lines bore the exact same fifteen-digit product number as

11

Plaintiff's earlier, corresponding Sphere.core product lines. Am. Compl. ¶ 36. That fact is highly probative of intent to deceive. To be sure, Defendant responds that it "has no idea where Plaintiff obtained his information," Dkt. 101 at 8, however, as Defendant acknowledges, the Court must accept Plaintiff's well-pleaded factual allegation as true on a motion to dismiss. Other notable factual allegations are that Plaintiff's customer had received its Sphere.core product through Defendant, but that it had been delivered in *Defendant's* SphereCel packaging. Am. Compl. ¶ 38. These allegations, along with Defendant's alleged wholesale copying of Plaintiff's product descriptions and webpages for Defendant's competing products, *id.* ¶ 40, are enough to make out a strong case that Defendant intentionally sought to deceive the public. This factor weighs heavily in Plaintiff's favor.

*Factor 7.* Actual confusion among the consuming public is an "important factor that weighs heavily in the overall likelihood of confusion analysis," which evidence "can be demonstrated by both anecdotal and survey evidence." *Good 'Nuff Garage*, 2022 WL 4485810, at *10. There is no survey evidence presented in Plaintiff's amended complaint. There are perhaps some allegations of anecdotal evidence of actual confusion, considering that one of Plaintiff's customers felt compelled to tell Plaintiff that its Sphere.core product it had purchased through Defendant had been delivered in Defendant's SphereCel packaging. Am. Compl. ¶ 38. Plaintiff alleges that it believes Defendant packaged "Plaintiff's Sphere.core product in 'SphereCel' packaging in an effort to mislead consumers and to pass off Plaintiff's product as its own or otherwise falsely imply a sponsorship by, or affiliation with, Plaintiff." *Id.* While more can be alleged, this factual allegation, taken as true and drawing all reasonable inferences in Plaintiff's favor—as the Court must do—lends credence to some proof of actual confusion. In any event, the Court notes that "[p]roof of actual confusion is unnecessary; the *likelihood* of

12

confusion is the determinative factor." *Shell Oil Co. v. Comm. Petroleum Co.*, 928 F.2d 104, 107 (4th Cir. 1991). This factor weighs somewhat in Plaintiff's favor, though not to as such a degree as it might have otherwise with additional allegations.

*Factor 8*. The allegations in the Amended Complaint do not address the quality of the defendant's product. Dkt. 101 at 9. The factor does not impact the Court's analysis on likelihood of confusion.

*Factor 9*. The last factor is the sophistication of the consuming public. Usually, "buyer sophistication will only be a key factor when the relevant market is not the public at large." *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 467 (4th Cir. 1996). In some cases, the "relative sophistication of the market may trump the presence or absence of any other factor." *Id.* The allegations in the complaint would appear to touch on this issue, though not to the extent Defendant wishes. Plaintiff alleges that its products "are used by a worldwide customer base in a variety of industries, including construction, automobiles, marine vessels and watercraft, pools and spas, piping, and medical equipment." Am. Compl. ¶ 11. Its products are sold through a network of over fifty distributors. *Id.* To be sure, the allegations may well support Defendant's argument that the general consuming public is not a buyer of "laminate bulker products," Dkt. 79 at 14—or, at least not often the buyer. Yet, given the wide-ranging set of industries and potential buyers for Plaintiff's products, the Court cannot conclude that all, or indeed even most, potential buyers are sophisticated entities such would be able to perceive the differences in the products and marks. While this factor weighs in Defendant's favor, it does not decisively weigh in Defendant's favor.

Weighing the factors above, the Court concludes that Plaintiff has sufficiently alleged likelihood of confusion, so as necessary to support plausible claims of trademark infringement and unfair competition under the Lanham Act. The claims survive the motion to dismiss.

Lastly, Defendant argues that this Court should limit Plaintiff's potential damages, on the basis that the Amended Complaint does not allege when Defendant would have had notice of Plaintiff's registrations or marks. But the Complaint does specify the U.S. PTO Registration Numbers of Plaintiff's Marks, which readily provides corresponding registration dates on the U.S. PTO website. In any event, the Court will deny this argument as premature, without prejudice to Defendant's ability to raise it again later in litigation.

For these reasons, Defendant's motion to dismiss is **DENIED**.

It is so **ORDERED**.

The Clerk of Court is directed to send a certified copy of this Memorandum Opinion and the Order to the parties.

Entered this  31st  day of March, 2023.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE